1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :    Case No. 1:16-cr-209
                              :
                              :
SHANNON M. SANCHEZ,           :
               Defendant.     :
                              :
------------------------------:

DETENTION HEARING

January 13, 2017

Before:   Liam O'Grady, USDC Judge

APPEARANCES:

Patricia T. Giles and Tobias D. Tobler,
Counsel for the United States

Thomas B. Walsh, Counsel for the Defendant

The Defendant, Shannon M. Sanchez, in person

2

INDEX

OPENING PROFFERS BY:

   MR. WALSH                                                4


WITNESS                              EXAMINATION      PAGE


    JOHN MOCELLO

                                  DIRECT           18
                                  CROSS            24


CLOSING ARGUMENTS BY:


   MR. WALSH                                                33
   MS. GILES                                                42
   MR. WALSH                                                46


COURT'S RULINGS

   THE COURT                                                47

3

1          THE CLERK:  The United States versus Shannon Marie

2     Sanchez, case number 16-cr-209.

3          MS. GILES:  Good morning, Your Honor.  Patricia Giles

4     and Tobias Tobler for the United States.

5          THE COURT:  Good morning again.

6          MR. WALSH:  Good morning, Your Honor.  Thomas Walsh

7     on behalf of Ms. Sanchez, who will be coming in.

8          THE COURT:  Right.  Good morning, Mr. Walsh.

9          All right, have a seat, Ms. Sanchez.  Good morning.

10          THE DEFENDANT:  Good morning.

11          THE COURT:  All right.  This comes on Mr. Walsh's

12     motion for review of conditions of release that were set by

13     Judge Nachmanoff on December 20, his ruling that there were no

14     conditions of supervised release that were available either for

15     the safety of the community or to prevent risk of flight.

16          So, Mr. Walsh, how to you want to proceed?  Do you

17     want to put your witness on again?  As I said last week, I did

18     read the transcript of the earlier hearing, but if you want to

19     put your --

20          MS. GILES:  We had not intended to put him on again,

21     Your Honor, given the Court's representation that you've

22     already seen the transcript.  I brought in another copy for the

23     Court if the Court would like to have it.

24          THE COURT:  I have it in front of me.  Thank you

25     though.

4

1          Mr. Walsh, do you want to call any witnesses then,

2    sir?

3          MR. WALSH:  I will proffer, Judge.

4          THE COURT:  I'm sorry?

5          MR. WALSH:  I will proffer evidence, yes.

6          THE COURT:  Sure.

7          MR. WALSH:  The evidence I would proffer would be

8    Detective Mocello would testify that on June 3, 2016, he met

9    with my client, Ms. Sanchez, voluntarily and they interviewed,

10   she came down to the station.

11         THE COURT:  That was after the search of the house?

12         MR. WALSH:  That's correct.  So she talked with

13   him -- this would be the proffer.  She talked to him at the

14   scene, and then he invited her down, and she voluntarily went

15   down.  She spoke to him for one hour and 30 minutes.

16         He would tell you that on July 14 that she again went

17   down to the police station and spoke with him one hour and

18   31 minutes, voluntarily.

19         And then he would also tell you that she voluntarily

20   spoke with him upon her arrest on December 15 for two hours and

21   10 minutes.

22         He would testify through his partner, Detective

23   Allen, that she kept in constant contact with the Police

24   Department on a monthly basis seeking the return of her

25   property.  The evidence would be --

5

1          THE COURT:  The guns?

2          MR. WALSH:  Not the guns, Judge.  The evidence was

3    the search of the house -- well, first off, on June 2, the

4    evidence will show that -- I believe it's June 2.  I could be

5    corrected by the detective.  But her truck was seized by a

6    warrant that was -- for a search warrant that is under seal.

7    So nothing was told to her, but just taking the truck out from

8    under her.

9          On June 3 there was a search of the house.  And it

10   wasn't the guns, it's great that the guns are in the testimony

11   there, but now that I've reviewed the statements that I didn't

12   have, she was seeking primarily the return of her car and then

13   all the things, such as the wifi, the Xboxes, the cell phones,

14   all the things that belonged to the family, not just the guns.

15   That would be the testimony.

16         Detective Mocello testified on page 9 of the

17   transcript that she told him she moved -- he testified she

18   moved to another location.  And on page 11 he would testify

19   that in November he talked to her on the phone and she said she

20   moved to her father's house in Maryland.

21         And on page 12, he spoke with her before the arrest

22   and she told the detective she lived in Forestville, Maryland.

23   He would say that she was living in Ft. Washington, okay, on

24   Locust Street.

25         However, the evidence would show when I

6

1    cross-examined him or had him testify, on July 14 at seven

2    minutes and 50 seconds into the interview, the voluntary

3    interview, during the interview Ms. Sanchez told the detective

4    that she had to sell her house, that she was two payments

5    behind in the mortgage, and she was probably moving to

6    Maryland.  That was in July of 2014.

7           The same interview, at one hour and 22 minutes, the

8    detective would tell that he said:  Why?  Is that because

9    you're moving?  And she said:  Yes.

10          At one hour and 26 minutes the detective would say --

11   the detective said:  He may want to talk to her again, which I

12   would rather talk to you by phone.  And she agrees to give him

13   her phone number and stay in contact.

14          At one hour and 27 minutes, under that same

15   interview, the detective says:  Because we have a lot of stuff,

16   a lot of your stuff.  If you move, there's paperwork, and I

17   need to get your new address to get that back to you.

18          The detective would testify, as the transcript says,

19   that in November there is a phone call.  The evidence would

20   show through his testimony that Ms. Sanchez again went to the

21   Leesburg Police Department on her regular basis trying to get

22   her property back, not the guns, all the property, and had come

23   in contact with Detective Allen.

24          The evidence will show through Detective Mocello that

25   another officer gives Ms. Sanchez a phone, and a phone call is

1   made between Detective Mocello and Ms. Sanchez.  Detective

2   Mocello calls Ms. Sanchez on a police officer's phone.  It's

3   recorded, we received the recording late yesterday afternoon.

4   And it will say in there, the detective testified under oath

5   that when he asked her for her address, she said it was the

6   Forestville.

7            But the recording will show that he says to her:  I

8   need to get the paperwork back to you, I need to get paperwork

9   back to you so you can get your property back.  What is the

10  address?

11           And she gives him the Forestville address.

12           Detective Allen will tell you that he has maintained

13  constant contact with her concerning the return of her

14  property.

15           THE COURT:  Well, he testified that he asked where

16  she was living, and she said Forestville.  And he knew that was

17  untrue, that they had a pole camera up at Fort Washington and

18  they knew she was living there.  Is that incorrect?

19           MR. WALSH:  That's incorrect in the aspect of when I

20  got the recording late last night, yesterday, I didn't see it

21  until late last night, what he says is:  Where are you living?

22  And she says:  What does that matter?  Ands he says:  I need to

23  get paperwork returned to you concerning the return of your

24  property.

25           Which is a farce, we know that's not true.  And she

8

1    says -- gives him the Forestville address.

2            Stephanie Sanchez is in the back of the courtroom.

3    She would testify that her sister was living at the Locust

4    address, which Michael's -- I mean, not Sanchez, excuse me,

5    Stephanie Spicer, her sister, who is in the back of the

6    courtroom, would testify she is living at the Locust address,

7    but the mail is not getting through there.

8            So Detective Mocello said in the recording:  I need

9    to send it to you certified mail.

10            And she gave her father's address because the mail is

11    reliable there.  Everything on the other address, because she

12    recently moved in there, was being sent back.

13            Michael Spicer would testify to the same think, he's

14    the father who owns that residence.

15            Detective Mocello would tell you that search warrant

16    on June 3, 2016, took hours, numerous hours.  And numerous

17    things were taken from the house and no inventory sheet was

18    left.  So she is pursuing items that were taken from the whole

19    family, her children and everything, and trying to gather them

20    back.

21            Detective Mocello would tell you that when she

22    called, the first inquiry is always about her truck because in

23    the phone call on November of 2016 she says -- she asks about

24    her truck.  And he says:  You have a Civic.

25            The Civic was a car that she had that they also

9

1    confiscated and took it for a period of time.

2              THE COURT:  This is the Suburban?

3              MR. WALSH:  There is a Suburban.  The Suburban was

4    taken in June and never returned.  There was a Civic --

5              MS. GILES:  I'm sorry to interrupt and I apologize,

6    but there are certain things that we're going to have to

7    correct factually regarding Mr. Walsh's representations of

8    things that Detective Mocello would testify to that are not

9    accurate.

10             THE COURT:  I will give you the opportunity to do

11   that when Mr. Walsh is done.

12             So how many cars are there?  There is a Suburban.  Is

13   that the truck?

14             THE COURT:  That's the truck.

15             MR. WALSH:  And then there is a Civic that was taken

16   in July.

17             THE COURT:  Right.

18             MR. WALSH:  Which prompted that interview in July.

19             THE COURT:  Okay.

20             MR. WALSH:  And that was taken for a period of time

21   under an under seal warrant, she didn't know why.  And it was

22   returned to her.  But on the November phone call, the Civic had

23   broken down, so she had no transportation, so she was

24   immediately asking about having her car returned because she

25   had no transportation for her kids.  That would be the

10

1    testimony.

2              THE COURT:  Okay.

3              MR. WALSH:  On page 13 the detective testifies in the

4    transcript that she confirms she was associated with MS-13 for

5    the past 20 years.

6              And on page 34:  She clearly stated she is a member.

7              But in the interview on June 3, 2016, at 46:35 the

8    detective will tell you that he says to her, asks her about

9    gang membership.  And he says:  Are you a gang member?  And she

10   says:  I suppose so, that's what they -- meaning the police --

11   indicate I am.

12             And then on 7/14, July 14 at 14:29, 14 minutes and 29

13   second, the detective says:  You normally associate with MS-13,

14   meaning you're around them.

15             And then on 7/14 at 14:40 she said she is not

16   familiar with the rank, but she was or she knew of -- knew

17   MS-13 20 years ago, but she didn't know the rank structure

18   then.

19             There is no -- in the recordings I would

20   cross-examine the detective, she never says:  I'm an MS-13 gang

21   member.

22             The detective testified on page 13 and 14 of the

23   transcript:  She talked about loyalty and respect she had for

24   the gang.

25             On 12/15, the interview on 12/15, at one hour and

11

1    10 minutes, the defendant says:  There's two things she asks

2    for in life, loyalty and respect, and that's to give to myself.

3            She never said she had loyalty and respect for the

4    gang.  She said 20 years ago that's what the gang did, but she

5    says she asks for loyalty and respect to herself.

6            So the testimony in the transcript where the

7    detective says she stated she had loyalty and respect for the

8    gang, that is not correct.

9            THE COURT:  Well, he also says she also talked about

10   how the gang has changed over the last 20 years and in her

11   opinion for the worse, right?

12           MR. WALSH:  That's true.

13           THE COURT:  Okay.

14           MR. WALSH:  She called her home -- the detective

15   would testify on page 15:  She called her home a gang home.

16           On 7/14, at the beginning of the interview, she

17   explained that because of the raid on her house, it was all on

18   the news, both the English news and the Spanish news, that it

19   was a gang house.  They called it a gang house, and she tells

20   him that.

21           On 12/15 at 51 minutes and 48 seconds, he says:  So

22   you're the gang house.  I get it.

23           He says to her.  She doesn't call it a gang house.

24   It's called a gang house.

25           As for his testimony concerning Daniel, Impaciente, I

12

1    think is the name, how you pronounce it, at her home in

2    Leesburg, she said she tried to stab him and you better find

3    him before she does and that she does not need to be out to

4    find him.

5              That's incorrect, Judge.  The evidence would show

6    that on July 14 the detective says to her, asks her about

7    dangerous people.  And she says:  Everybody can be dangerous.

8    And she says:  If you mess with my kids, I could be dangerous.

9              On December 15 at 40 minutes and 41 seconds the

10   detective brings up Daniel or that nickname of him concerning

11   having, the quote is "lovey-dovey with Jasmine."  And it hurt

12   me, it hurt for me -- and it hurt -- and that it hurt for them,

13   for me to see them.  And she responds:  Well, I hope you find

14   him before I do.

15             And then detective responds:  Shannon, you're not

16   going anywhere.  And that's when she says:  That's fine, I

17   don't have to go anywhere.

18             She never says, she didn't need to be out to find

19   him.  She never said that.  That's incorrect.

20             During that interview, which the evidence will show,

21   on December 15, they, the detectives, there is another

22   detective named Nick, are prodding her.  Because what they say

23   to her is, they say this Daniel gentleman, they said:  We know

24   that you had a relationship with him, and he traded you in for

25   a younger model, your daughter.

13

1          And that's what prompted those statements about you

2     better find him before I do.

3          Michael Spicer is in the back of the courtroom.  He

4     would testify that he owns 108 Appletree in Leesburg with her,

5     and that it had to be sold.  He owns 2556 Oak Glen Way,

6     District Heights or Forestville, Maryland, they are called

7     both, and that that is a reliable place to receive mail.

8          He'll also tell you that 7904 Locust Lane, Fort

9     Washington is his residence.

10          Detective Mocello will tell you that she said she

11     lived at her father's house which is correct, she lived at her

12     father's house.

13          He'll testify that his daughter was living there.

14     That she had recently moved there.  That the mail is more

15     reliable at his residence due to the change in tenants in that

16     house, and mail is being returned.  He would tell you that some

17     of the guns that were taken from the residence are his, the

18     shotguns, the black powder.

19          Also, that was acknowledged on June 3 in the

20     interview at 41:59 where Ms. Sanchez told Detective Mocello

21     that the guns belonged to her -- some of the guns belonged to

22     her father.

23          Michael Spicer would tell you that the children, her

24     children now are struggling.  That they're having to be driven

25     to school by her sister Stephanie.  And that they're struggling

14

1    in school because of the change in not having their mother.

2              He would also testify that he is local.  Ms. Sanchez'

3    mother is local.  The sister, who is in the courtroom,

4    Stephanie.  Brother who is in the courtroom.  And her kids and

5    two of her children are in the courtroom, Jasmine and Angel are

6    in the courtroom as support of her, saying they need her

7    concerning their school.

8              Michael Spicer will tell you, and it's incorrect in

9    the presentence report where it states that -- on page 2 it

10   says, the second paragraph says, or third -- the second full

11   paragraph.  It says:  The defendant's father reported that the

12   defendant was a member of the gang MS-13 approximately 20 years

13   ago.

14             He didn't say that.  He would tell you that he said

15   she associated with that.  And what happened was one of the

16   gentleman was trying to date her, and that's when he stopped it

17   because he didn't want him to take her out and he was

18   confronted by members of MS-13.  He is in the courtroom and

19   would clarify that.

20             Stephanie Spicer is here and would testify, Your

21   Honor, that she has been taking on the responsibility of the

22   children since Shannon is in jail.  It's extremely difficult,

23   the children are struggling.

24             She would also tell you, and Detective Mocello will

25   tell you this, Detective Mocello would tell you that in a

15

1    conversation he had with Ms. Sanchez, he said that she would

2    protect her children.  She would do anything to -- and he

3    recognized she would protect her children.

4           Also in the conversation with Detective Mocello on

5    December 15, he stated during the interview -- and I will find

6    that.  At one hour and one minute, the detective said:  I was

7    going to -- Ms. Sanchez says:  I was going to Leesburg Police

8    Department.  And the detective said:  I know, it was on this

9    date, the date of her arrest.  I knew it was a setup.  I was

10   not running.  And detective says:  I know you were not running,

11   you were not fleeing.

12          The evidence will show that Ms. Sanchez and Detective

13   Mocello had a conversation that week about meeting.  It was a

14   Thursday, the 15th.  She had to take off work for that day to

15   meet with him at 10 o'clock.  She asked if she could meet with

16   him Wednesday.  And he said, no, he preferred Thursday because

17   it was a setup.  They raided the house, he will tell you, at 6

18   in the morning with her kids in handcuffs and everything else.

19          And as she was interviewing on the tape, her phone

20   alarm goes off at one hour and two minutes.  And Ms. Sanchez

21   tells the detective:  That alarm is because I was supposed to

22   meet you have at 10, I have to leave the house now.

23          She had no intent to run, she was meeting him.

24   That's when he says:  I know you weren't going to run.

25          Ms. Spicer would tell you, Stephanie Spicer would

16

1    tell you that Ms. Sanchez is gainfully employed.  I have a

2    letter that I will submit, it's an e-mail from the employer,

3    that I would hand up to the Court.  It's from Kelly Shaffer,

4    it's Kelly's Klean, Quality Klean.  She is gainfully employed

5    there.  Her job is being held.  She has been reliable in

6    showing up to the job in Maryland.

7          Ms. Spicer will tell you that all the ties to the

8    community, she has strong ties to the community.  She has lived

9    in Northern Virginia her whole life with her family.

10         Ms. Spicer would also tell you that Ms. Sanchez has a

11   carry permit, a gun carry permit.  She got that after her

12   husband was arrested for basically assaulting or touching the

13   child, Jasmine.  And Detective Mocello will tell you that a map

14   was found in the jail cell of her ex-husband now of that house,

15   for some retaliation of some sort.  And that's when she sought

16   a gun permit.

17         I submitted the form from Kelly Shaffer, Quality

18   Klean, she is reliable, hard working, has been working there

19   for months, and her job is waiting for her.

20         Ms. Spicer would tell that you Ms. Sanchez is

21   physically and mentally healthy.  The family needs child

22   support.

23         And Detective Mocello will tell you upon the time of

24   her arrest on December 15, that Ms. Sanchez said she was

25   struggling to try to feed her kids and keep her kids on line

1   and going to school, and she was working as much as she can.

2   And you have seen the e-mail that says she is working the

3   minimum of four days, she is doing as much as she can to

4   support these children.

5           Additionally, the evidence would be that she has no

6   felonies.  She has no violent crimes.  No drug cases.  She is

7   not charged with a violent crime, she is not charged with a

8   drug case of at least ten years or more.  She is not charged

9   with a crime with a maximum of life.  She has not been

10  convicted of two prior sets of those crimes.  And she has no

11  violence involving a minor.

12          Judge, the evidence will show she has no FTAs, no

13  contempt of courts.  She has no -- she is not on parole or

14  probation, the evidence will show.

15          She only has a misdemeanor, misdemeanors on her

16  record back in 1999 or 2000.  She has no serious drug problem,

17  although she acknowledged smoking marijuana, she was candid

18  about that.  And she never attempted to flee Detective Mocello.

19          Judge, that's the evidence I would present in

20  conflict or more like an explanation or maybe a fuller story of

21  the transcript that the Court had when I didn't have the

22  statements.

23          THE COURT:  All right.  Thank you, Mr. Walsh.

24          Go ahead and call the detective if you --

25          MS. GILES:  Pardon me?

J. Mocello - Direct

1          THE COURT:  Do you want to call the detective?

2          MS. GILES:  Yes.

3          THE COURT:  All right.  Please come and be sworn.

4          NOTE:  The witness is sworn.

5          JOHN MOCELLO, called by counsel for the United

6  States, first being duly sworn, testifies and states:

7          DIRECT EXAMINATION

8  BY MS. GILES:

9  Q.    Good morning.

10  A.    Good morning, ma'am.

11  Q.    Would you please state your name.

12  A.    Detective John Mocello.  It's M-o-c-e-l-l-o.

13  Q.    And how are you employed?

14  A.    I'm a detective with the Leesburg Police Department,

15  currently assigned as a task force officer with the FBI Safe

16  Street Task Force here in Northern Virginia.

17  Q.    And, Detective, you previously testified at the detention

18  hearing for Ms. Sanchez back on I believe December 20 of this

19  year?

20  A.    That's correct.

21  Q.    And have you reviewed your transcript of that testimony?

22  A.    I have.

23  Q.    And do you adopt that testimony, part of that -- do you

24  adopt that transcript as part of your testimony today?

25  A.    Yes.

J. Mocello - Direct

19

1   Q.   You just sat in the courtroom and heard some of the

2   representations of Mr. Walsh in terms of what you would testify

3   to regarding to statements that his client made?

4   A.   That's correct.

5   Q.   In reference to the addresses that she provided you of

6   where she was living, do you recall a November 7 conversation

7   that you had with her over the telephone?

8   A.   I do.

9   Q.   And was that actually recorded?

10  A.   It was.

11  Q.   And in that conversation, did you ask her where she was

12  living at the time, what her new address was?

13  A.   I did.

14  Q.   And do you recall what she told you her address was?

15  A.   I don't remember the -- I don't remember the full address.

16  It is in my notes.  But it was District Heights, Maryland.

17  Q.   Okay.  You say you don't recall it but it was in your

18  notes.  If I hand those notes up to you and you review them,

19  could you recall the address?

20  A.   Yes, ma'am.

21       THE COURT:  Go ahead.

22  A.   2576 Oak Glen Way, District Heights, Maryland.

23  Q.   Thank you.  And then prior to her arrest in December, did

24  you also have an occasion to speak -- oh, I'm sorry, before I

25  go on.

J. Mocello - Direct

20

1          She gave you that address in District Heights,

2  Maryland?

3  A.   Correct.

4  Q.   But this is at the time that you had the pole cam up, so

5  you knew where he was staying?

6          MR. WALSH:  Objection, leading, Judge.

7          MS. GILES:  It's already in --

8          THE COURT:  Overruled.

9          MR. WALSH:  All right.

10          THE COURT:  Overruled.

11  A.   That's correct.

12  BY MS. GILES:  (Continuing)

13  Q.   Okay.  And what was that address again?

14  A.   That was on Locust Lane in Fort Washington, Maryland.

15  Q.   And then I believe you also testified that a week prior to

16  her arrest, that you spoke with Ms. Sanchez again in reference

17  to where she was living?

18  A.   That's correct.

19  Q.   And did you ask her where she was living?

20  A.   I did and -- or I asked where she was staying.  And she

21  said Forestville, Maryland.

22  Q.   And did you actually write that down on a Post-it note?

23  A.   I did.  The only thing I wrote down was Forestville,

24  Maryland.

25  Q.   And did you provide that to me yesterday?

21

1    A.   I did.

2         MS. GILES:  Your Honor, I provided that to Mr. Walsh

3    as well yesterday.

4         THE COURT:  I'm sorry.

5         MS. GILES:  I provided that Post-it note to Mr. Walsh

6    as well yesterday.

7         THE COURT:  All right.

8    BY MS. GILES: (Continuing)

9    Q.   Now, Mr. Walsh also proffered to the Court that you would

10   testify regarding Ms. Sanchez' contacts with a Detective Allen?

11   A.   That's correct.

12   Q.   Do you know anything about her contacts with Detective

13   Allen?

14   A.   I know they had some.

15   Q.   Do you know how often?

16   A.   I don't.

17   Q.   Now, also Mr. Walsh testified that Ms. Sanchez didn't

18   admit to you that she was in the gang.

19   A.   He did say that.

20   Q.   Actually, if you could -- if I could refer you to page, I

21   believe it's 34 of the transcript.

22        Your Honor, may I hand up a copy of the transcript?

23        THE COURT:  To the detective?  Certainly.

24   Q.   Thank you.

25   A.   You said 34, ma'am?

J. Mocello - Direct

22

1    Q.   Yes, 33.  Line 22.

2    A.   Yes, ma'am.

3    Q.   You were asked:  Did she say she was a member?  And you

4    responded:  She would say, she would indicate membership and

5    then she would recant during the interview or change the story.

6    A.   That's correct.

7    Q.   Now, have you reviewed the recording of that interview of

8    her arrest?

9    A.   I did.

10   Q.   And do you recall how often she would recant?

11   A.   It would be back and forth throughout the entire

12   interview.

13   Q.   During the course of the interview -- did you actually

14   make notes of your --

15   A.   I did.

16   Q.   While you were watching?

17   A.   I did.

18   Q.   And in the course of reviewing it, did you -- do you

19   recall her -- you asking her:  Why did you join the gang?

20        And her responding:  It's like family, they don't

21   judge you.

22   A.   Yes, ma'am.

23   Q.   Okay.  Now, you also -- the testimony or the proffer

24   regarding the gang house.  Do you recall what the context was

25   of Ms. Sanchez referring to her home as the gang house?

J. Mocello - Direct

23

1    A.    Yes, ma'am.  We were talking about her husband, Yugo

2    Sanchez, because I was the detective that investigated and

3    arrested him.  And she was talking about after that arrest she

4    learned of her ex-husband trying to threaten her, rob her, set

5    her up.  And that the reason people didn't do that is because

6    she was the gang house.

7    Q.    Okay.  So it was not in reference to the context of there

8    being the search warrant?

9    A.    That's correct.

10   Q.    At any time when you spoke with her, did Ms. Sanchez ever

11   indicate to you that she was staying on Locust Lane?

12   A.    Never.

13   Q.    And in the course of your interviewing her, did you all

14   ask Ms. Sanchez about other members of MS-13?

15   A.    We did through all the interviews.

16   Q.    And would she be forthcoming with information about what

17   you asked?

18   A.    No.

19         MR. WALSH:  Objection, Your Honor, speculation as to

20   whether she was forthcoming.

21         THE COURT:  Overruled.  He just testified and it is

22   also all throughout the transcript of the other hearing that

23   they were asking about other members, and the pole camera, did

24   it identify other members.  This is all permissible.  Your

25   objection is overruled.

J. Mocello - Cross

1          Go ahead, answer the question.

2     A.   I believe the answer is no, she was not forthcoming.

3     BY MS. GILES: (Continuing)

4     Q.   Did you ask her specifically about whether other

5     individuals were members of MS-13, people that law enforcement

6     knew were members?

7     A.   We did.  And people she associated with, and showed her

8     photos of those people, and she would not answer.

9     Q.   Okay.  All right.  And in fact, at least one of those

10    individuals was David -- was one of those individuals Dublas

11    Lazo?

12    A.   Yes.

13          MS. GILES:  Thank you, Your Honor.

14       CROSS-EXAMINATION

15    BY MR. WALSH:

16    Q.   Detective, do you adopt this as your testimony?

17    A.   That's correct.

18    Q.   Everything in here is true?

19    A.   That is what I said.

20    Q.   Okay.  And everything you have testified in there is true?

21    A.   Everything is true.

22    Q.   Counsel asked you about the phone call and the address she

23    gave.  Did you review that recording?

24    A.   I have reviewed it.

25    Q.   November 7, correct?

1    A.    That's correct.

2    Q.    Okay.  And you asked her what her address was, and she

3    wouldn't tell you; isn't that correct?

4    A.    That's correct.

5    Q.    Okay.  And then you asked her where you wanted to send --

6    you needed to send paperwork certified mail, correct?

7    A.    I don't recall if I said certified, but I definitely

8    talked about things I needed to send papers to.

9    Q.    And that's when she told you the Forestville address,

10   correct?

11   A.    She did not say Forestville on November 7.  She said

12   District Heights on November 7.  She said Forestville in

13   December.

14   Q.    Are you familiar that District Heights and Forestville are

15   the same address?

16   A.    No.

17   Q.    You are aware that when she told you -- you asked her

18   where she lived and she said her father's house, correct?

19   A.    She did.

20   Q.    She was living at her father's house, wasn't she?

21   A.    She is living at a house her father owns.

22   Q.    Her father's house, correct?

23          THE COURT:  Well, make it -- does he live there

24   full-time?  Is that the house he lives in?

25          MR. WALSH:  That was the context --

J. Mocello - Cross

26

1          THE COURT:  I mean, that's a totally confusing

2     question.  So let's clear it up.

3          MR. WALSH:  Fair enough.

4     BY MR. WALSH: (Continuing)

5     Q.   She told you she lived at her father's house, right?

6     A.   That's what she said.

7     Q.   Her father owns the house, correct?

8     A.   I believe so.  It's what I've been told.

9     Q.   As a matter of fact, he owned three houses, correct?

10    A.   That's what I've been told.

11    Q.   So when you she told you she lived at her father's house,

12    it was correct?

13    A.   She lived at a house her father owned.

14    Q.   Okay.  Detective Allen is your partner, right?

15    A.   Detective Allen is one of my partners.

16    Q.   Okay.  He is involved in this case with you, correct?

17    A.   He is.

18    Q.   Okay.  You reviewed his reports, right?

19    A.   I have not reviewed his report.

20    Q.   You testified about some of the stuff he told you,

21    correct?

22    A.   That's correct.

23    Q.   Okay.  On the phone call of November 7, Ms. Sanchez went

24    to the Leesburg Police Department, correct?

25    A.   That's correct.

J. Mocello - Cross

27

1   Q.   And had contact -- and asked for Detective Allen, correct?

2   A.   No, she asked for me.

3   Q.   Okay.  And Detective Allen was there, correct?

4   A.   No, he was not.

5   Q.   Okay.  And that's when the phone call happened, correct?

6   A.   That's when I had my sergeant go out and give her her

7   phone because she said she didn't have one.  And I talked to

8   her on my sergeant's cell phone.

9   Q.   Do you recall on July 14 meeting with Ms. Sanchez for over

10  an hour?

11  A.   Yes, I do.

12  Q.   Do you remember her telling you in the beginning that the

13  raid was on the TV?

14  A.   Yes, we talked about that.

15  Q.   Spanish and English channels?

16  A.   Yes, we did.

17  Q.   Do you remember her telling you that they call it the gang

18  house?

19  A.   Yes.  I don't know -- let me step back.  I don't recall

20  exactly what she said and how she said it, but we did talk

21  about something like that.

22  Q.   Fair enough.  You don't recall how she said and what she

23  said in most of these interviews; isn't that correct?

24  A.   I don't recall verbatim.  Like if you want to review that,

25  they are all recorded.

J. Mocello - Cross

28

1   Q.   Right.  And did you record the June 3 interview?

2   A.   We did.

3   Q.   Did you review it?

4   A.   I did.

5   Q.   For the testimony in this trial?

6   A.   I did not review the report right now.  I have reviewed

7   it, I have written it.

8   Q.   Prior to testifying?

9   A.   Prior to testifying.

10  Q.   Did you review the July 14 interview?

11  A.   Yes, I have.

12  Q.   Okay.  Prior to testifying today too?

13  A.   That's correct.

14  Q.   Do you recall on 6/13/2016, June 3, Ms. Sanchez at

15  20 minutes asking you:  Why, why the warrant?

16          Do you recall that?

17  A.   I recall we discussed something to that nature, yes, sir.

18  Q.   Do you recall you telling her:  It's about gang

19  participation stuff?

20  A.   I'm sure that's something -- I'm sure that's something I

21  said.

22  Q.   You reviewed it though, you told me just now, before you

23  testified, correct?

24  A.   I'm being honest with you, sir, I did review it.  I'm not

25  remembering everything verbatim, and I don't want to get that

J. Mocello - Cross

29

1    wrong for His Honor.

2    Q.   Okay.  So safe to say she didn't know what it was about,

3    the search warrant, correct?

4    A.   Not initially.

5    Q.   You told her it was gang stuff?

6    A.   We did.

7    Q.   Do you recall her telling you at 41 minutes and 59 seconds

8    that two of the shotguns and the black powder gun was her

9    dad's?

10   A.   I believe she said either her dad's or she was given them

11   by her father.

12   Q.   Do you recall at 46 minutes and 35 seconds you said to

13   her:  Are you a gang member?

14          And she said:  I suppose so, that's what they said?

15   A.   She said that.

16   Q.   Okay.  Do you recall on July 14, 2016, at seven minutes

17   and 50 seconds, she told you that she probably was going to

18   move to Maryland?

19   A.   That's correct.

20   Q.   And she told you that she was behind in payments on the

21   house?

22   A.   That's correct.

23   Q.   And she had to sell it?

24   A.   That's correct.

25   Q.   Do you recall you saying at eight minutes and 40 seconds:

J. Mocello - Cross

30

1    I think you would shield your kids from dangerous people.

2          Do you recall telling her that?

3    A.   If she moved to Maryland, I did say that.

4    Q.   Or if she moved anywhere?

5    A.   I did.

6    Q.   Do you recall her telling you:  I could dangerous if you

7    mess with my kids?

8    A.   She did say that.

9    Q.   Okay.  That was eight minutes and 50 seconds, correct, in

10   that interview?

11   A.   I don't know what time you're referencing, but she said

12   that during that interview.

13   Q.   Do you remember at 14 minutes and 40 seconds:  Are you

14   familiar with the MS gang structure?  And she saying:  Not

15   really?

16   A.   I don't know what she said.  But she did indicate she did

17   not know the structure during the July 14 interview.

18   Q.   And then at 14 minutes and 55 seconds do you recall her

19   telling you that back 20 years ago there was no real structure?

20   A.   During the July 14 interview she said that.

21   Q.   As a matter of fact, you kept saying, let's talk about

22   historically about the MS-13 stuff, correct?

23   A.   I did.

24   Q.   So some of the -- so a lot of the discussion that you have

25   talked to His Honor in this transcript pertains to historical

J. Mocello - Cross

31

1    stuff, correct?

2    A.    During the July 14 interview.  The December 15 interview

3    we talked actively of what was occurring now.

4    Q.    On December 15 do you recall Detective -- I don't know his

5    last name, I apologize, he introduced himself as Nick, telling

6    her that basically this gentleman Daniel traded the older model

7    in for the new model?

8    A.    Special Agent Durgin did say that.

9    Q.    Durgin.  How do you spell that?

10   A.    D-u-r-g-i-n.

11   Q.    And that was during the time when she said that:  I hope

12   you get to him before I do; right?

13   A.    I don't recall if it was before or after, but it was

14   during that conversation.  And we were also asking for his

15   location because he was wanted and we were trying to locate

16   him.

17   Q.    And she told you she didn't know where he was located, but

18   she gave you his mother's address, correct?

19   A.    She actually told us to look in Leesburg until later on in

20   the interview.  She gave us a location where his mother was and

21   stated that he may be at that location.

22   Q.    And she told you she didn't know where he was because she

23   doesn't have contact with him, correct?

24   A.    No since Monday.  That was Thursday.

25   Q.    Do you recall the alarm going off on her phone?

32

1    A.    Yes.

2    Q.    And that was during the interview, correct?

3    A.    It was.

4    Q.    And that alarm, she told you, was to help meet you at the

5    Leesburg Police Department?

6    A.    That's right.

7    Q.    Right?

8    A.    Yep.

9    Q.    And you told her:  I know you are not going to run;

10   correct?

11   A.    Probably said that.

12           THE COURT:  Are you about done, Mr. Walsh?

13           MR. WALSH:  Almost, Your Honor.

14           THE COURT:  Okay.  I mean, the proper -- you know, to

15   the extent -- I don't want you just to repeat what you said the

16   proffer was because the Government hasn't quibbled --

17           MR. WALSH:  They have kind of tried to water it down

18   a little bit, but --

19           THE COURT:  Yeah, okay.  Repetition is not necessary.

20   I'm awake and listening.

21           MR. WALSH:  That's fair.

22   BY MR. WALSH: (Continuing)

23   Q.    Well, I am going to ask you this, Detective Mocello.

24           Ms. Sanchez has not avoided having contact when

25   you've asked to met with her, has she?

33

1   A.   She has not.

2   Q.   And the appointments you set up or the voluntary

3   questions, she has come and met with you, correct?

4   A.   She has.

5   Q.   And she spent hours talking to you, correct?

6   A.   She did.

7          MR. WALSH:  I don't have any other questions, Judge.

8          THE COURT:  All right.  You may be excused.  Thank

9   you.

10          THE WITNESS:  Thank you, Your Honor.

11          NOTE:  The witness stood down.

12          THE COURT:  All right.  Any other witnesses?

13          MS. GILES:  No, Your Honor.

14          THE COURT:  All right.  Mr. Walsh, I will let the

15   Government respond after you.  Do you have anything else you

16   wanted to make, argument?

17          MR. WALSH:  I do.  Judge, Your Honor, as we know,

18   under U.S. v. Williams, this is a de novo hearing.  And the

19   Government -- excuse me.  The Government relies on Detective

20   Mocello's testimony at the lower court or the magistrate court

21   and also some testimony here.

22          And we can see there is some differences in his

23   testimony, but it's interesting -- the Government relies on two

24   factors.  Thank you.  The Government relies on two factors.

25   And I would -- danger to the community, I think they said, and

34

1    risk of flight.

2           But let's talk about that first.  U.S. versus Leyba

3    says pretrial detention is an exception rather than a rule in

4    federal cases.  The Bail Reform Act changed the legal standard

5    to require release if there exists conditions which will

6    reasonably assure the defendant's appearance and safety of

7    others.

8           And the Leyba -- I don't know why I don't have the

9    cite here.  The Leyba case, Judge, also comes into play with

10   the review of the Pretrial Services report because Pretrial

11   Services -- I'm going to change gears right here -- relies on a

12   prior arrest for a felony and not a conviction.  And Leyba

13   says, and it's 104 F.Supp. 2d, 1182, which lays out basically

14   the language I just told the Court.  It says:  The Court can

15   find no legal authority to support the use of prior arrests

16   which did not result in convictions as a basis of finding a

17   danger to the community.

18          So I would obviously object to that, that's not

19   relevant in the Pretrial Services report.

20          Your Honor, as I look at the statute and I read U.S.

21   versus Giordano, and I cited it, 370 F.Supp. 2d, 1256, it's a

22   nice case because it lays out how to address 3142.  And that

23   case lays out the six factors basically when you get to, after

24   your initial appearance and the request by the Government has

25   to be there for detention and then come back for a detention

1   hearing, that statute, in reviewing the statute, when you go to

2   subsection (f), the Court is to hold a filing -- a hearing,

3   excuse me, on the Government's motion.

4           And it is supposed to address basically six factors.

5   And Giordano says that.  The first four are presumptions, crime

6   of violence.  That's not a crime of violence.  She is an

7   accessory after the fact, that's what she is charged with.  And

8   she has the presumption of innocence, we can't forget that.

9           A crime of a maximum sentence of life.  Well, that's

10  not the case here.

11          A crime that is a drug offense that is ten years or

12  month.  Well, that's not the case here.

13          A crime where she's committed two -- where she has

14  been convicted of two or more of that felonies.  Well, that's

15  not the case here.  We know her record.

16          And a crime of violence involving a minor.  Well, we

17  know that's not the case here either.

18          So there is no presumption.  What we have is we have

19  the presumption she should be released.

20          So then we look at the last two, and that's serious

21  risk that the person will flee.  Well, the detective just told

22  you on the stand he knew she wouldn't run.

23          The evidence before this Court is she has kept in

24  constant contact.  She has called on, I would submit, a monthly

25  basis, if not more.  And she doesn't call, she goes down to the

36

1   police station and inquiries about -- because all her property

2   has been taken.  Inquires about getting her property back for

3   her kids wifi and Xbox and things of that nature.  They

4   highlight the guns, but it's all the stuff.

5           And what's interesting, it's a search warrant that's

6   under seal, so she doesn't know what they took.  I mean,

7   they're in the house 10, 12 hours taking all kinds of stuff.

8           So I would submit she is not a serious risk of flight

9   by any means.  She doesn't give the detective the exact -- she

10  says, I live in my father's house, which is a true statement,

11  it's his house.  And then she says she gives him, and Ms.

12  Spicer would testify to that, the proffer is that the mail is

13  more reliable at the Glen Oak, I think it is, address.

14          And so, that's the address she gives him because he

15  keeps using this -- he's not telling the truth.  He's saying,

16  look, I need this property back to you, I need to get this

17  property back to you.  And she gives the address for the

18  certified mail -- or the mailing, the detective doesn't

19  remember if it's certified, but the recording says different.

20          Or serious risk that such person will obstruct or

21  attempt to obstruct justice, threaten, or injure, or intimidate

22  witness or juror.  That's not the case here either.  She is

23  protecting her kids, and that person is not a witness or a

24  juror.

25          So she doesn't -- none of the factors of (f) even

37

1    qualify.  To then go to (g).  Remember, the understanding in

2    the Bail Reform Act is she is to be released.  She is an

3    accessory after the fact on what the Government would say is a

4    very serious charge, but the charge she is facing, accessory

5    after the fact, the maximum is 15 years.  She has got no

6    priors.  She has got strong ties to the community.  She has got

7    four children, two of them in the back of the courtroom,

8    Jasmine and Angel Sanchez.  And she has been in constant

9    contact with the Leesburg Police Department and the detective.

10   And the detective has told you, she has never avoided a

11   meeting, she has voluntarily come down and talked, hours on

12   end.

13          U.S. v. Jackson, 845 F.2d 1262, and U.S. v. Hammond,

14   204 F.Supp. 2d, 1157 says:  Gang membership is insufficient by

15   itself to justify detention.

16          She is not even -- and the detective says she is

17   associated 20 years ago.  She doesn't know the rank, she

18   waffles back and forth, his testimony.  That she is not a gang

19   member.  She is a gang member possibly or whatever else.  That

20   alone doesn't justify detention based on danger, the factors,

21   Judge, of (g).

22          And her release -- she maintains employment, and she

23   has a job waiting for her, and her kids are relying on her.

24          The Court can order her not to associate with any of

25   these people, a condition she can comply with.  No contact with

38

1   witnesses or victims, she can comply with that.  She can abide

2   by a curfew.

3           The Leesburg Police Department has all the guns,

4   nothing has been returned.  So she doesn't have firearms.  She

5   can abstain from use of drugs.  These are all conditions that

6   will assure, I would submit -- risk of flight is not even a

7   question at this point in time in my mind, but a danger to the

8   community, which the Government will argue, will assure that

9   she is not.

10          She is willing to electronic monitoring.  Her father

11  is in the courtroom.  And he is willing to be a third-party

12  custodian with electronic monitoring.  And have her with her

13  kids.

14          Ms. Spicer will tell you that she is having trouble

15  getting the kids to school because she has got her own duties.

16          And the understanding under this code section of 3142

17  is she is to be released.  The presumption is release.  It's

18  not a presumption case.  The burden is on the Government.

19          And I would submit, even if you look at that

20  transcript, the transcript was testified to and the Court -- we

21  mentioned this at prior arraignment.  The Court said, Mr.

22  Walsh, do you have evidence?  I never any of these statements,

23  these recordings.  Now I have got them, it's a different story.

24  That's why I didn't present evidence, because now I have the

25  statements.  And I got two statements last night, the

1    recording, which I reviewed, and these lengthy interviews.

2              And so, there is a little bit of difference in what's

3    going on.  So I would submit to the Court --

4              THE COURT:  What I didn't hear today was the

5    reference that she attempted to stab Flores, I think, in the

6    driveway.

7              MR. WALSH:  I did with that.  I asked her, on 7/14,

8    he says to her:  I understand you would protect your children.

9              THE COURT:  Right, I heard all that.

10             MR. WALSH:  And she says, well -- what happened was

11   it's Daniel Flores, but the question I asked or I proffered his

12   nickname is Impaciente, I-m-p-a-c-i-e-n-t-e.

13             THE COURT:  Right.

14             MR. WALSH:  So that was about the time where they

15   were -- when she mentioned that, it was 12:15 when they said:

16   He traded you in for a newer model.  Daniel is the same name

17   as, that nickname is the same as Flores.

18             THE COURT:  Are you denying that the tape says that

19   she attempted to stab him.

20             MR. WALSH:  I'm not denying that she said that.

21   There is no evidence of that.  But --

22             THE COURT:  Except her own statement.

23             MR. WALSH:  But her own statement.  But what it is,

24   it is made in context, Judge, it's made in context --

25             THE COURT:  Yeah, I heard the rest of it and I got

1    the context, but I didn't hear that specific reference.

2            MR. WALSH:  But I would proffer or I would say to the

3    Court that that statement is over-blown.  She didn't have a

4    knife to stab him.  She was out in the driveway and probably

5    wanted to stab him because he is messing with her daughter that

6    she is protecting.

7            The detective said, you are the one that would

8    protect your kids.

9            And along the same lines where it says:  Anybody

10   would be dangerous, I would be dangerous if you mess with my

11   kids.

12           THE COURT:  Okay.

13           MR. WALSH:  Which puts it in context.  If the Court

14   is going to -- or if the Government is going to rely on that as

15   being a risk to the community, there is no violence in this

16   young lady's background, of a history of convictions or

17   anything along those lines.  She is charged today with

18   accessory after the fact.  She makes a candid statement,

19   probably flippant because they are pushing her about, hey,

20   younger model kind of thing, and she says, I'd stab him.

21           Well, and then she didn't say that about getting out

22   of jail argument, you better find him -- she says, you better

23   find him before I do, about this getting out of jail.  She has

24   no -- I think the statement was -- anywhere.  That's fine, I

25   don't have to go anywhere, was her statement.

41

1          Even though he testified differently, the statement

2     that I would proffer that's on the recording, different from

3     his testimony in the transcript, is that she said:  -- he says:

4     Shannon, you're not going anywhere.  And she says:  That's

5     fine, I don't have to go anywhere.  She doesn't say, while I'm

6     in jail, which is a contradiction in the testimony.

7          THE COURT:  I got that.  Okay, finish up.

8          MR. WALSH:  And so I would submit, Judge -- I mean,

9     she is not a risk of flight, we know that.  She is not a danger

10    to the community.  She has got kids back here.  She has got

11    ties to the community.  She has never been charged with violent

12    offenses.  She meets all the factors of 3142(g).

13          And the Government doesn't get passed 3142(f) because

14    it doesn't qualify under serious risk of flight or risk that

15    such person will obstruct or attempt or obstruct justice,

16    threaten, injure, or intimidate.  And the attempt to obstruct

17    justice, the Government may say, well, look, they gave a fake

18    address or something like that.

19          And I explained, she gave it to get the property

20    back.

21          And secondly, she has always met with him and come

22    and talked to him, and she has given him cell phone numbers as

23    to how to contact her.

24          THE COURT:  All right.  Thank you, Mr. Walsh.

25          MS. GILES:  Thank you, Your Honor.

42

1          THE COURT:  Ms. Giles.

2          MS. GILES:  The Court has accurately noted, they

3  can't dispute her reference to attempting to stab Mr. Flores.

4  Those were her statements, her words.

5          And in the context of the interview, what she

6  actually says is:  If you've got the pole cam up, then you know

7  that I've done it, I tried to stab him.  Because that's when

8  she found out about him having relations with her daughter.

9  That in and of itself, Your Honor, makes her a danger to the

10  community.

11          Now, Mr. Walsh spent a great deal talking about.

12  3142(f).  3142(f) speaks to when the Court holds the hearing.

13  Not what the Court considers when evaluating whether or not

14  there is any combination of conditions or any conditions that

15  would both establish the safety of the community and maintain

16  the safety of the community and establish like the defendant is

17  not a danger.  Or, two, that there is no risk of nonappearance.

18          So the Court always looks at appearance and danger.

19  And it is only at this talking about when the Court can hold a

20  hearing and under what circumstances, like which qualifies for

21  the danger and which qualifies for flight and obstruction.

22          So we're beyond that, Your Honor, because we

23  established at the initial hearing why we were asking for her

24  detention.

25          One, we have shown that there is a risk of

43

1    obstruction here.  This defendant is charged with being an

2    accessory after the fact to a kidnapping resulting in death.

3    She is an accessory after the fact.  That may not be an

4    obstruction charge, but it is in the same vein.

5         And she is already -- and the grand jury has already

6    found probable cause that she has committed that crime.

7         When you talk about the flight, Your Honor, there is

8    ample evidence that she is risk of flight.  They talk about her

9    employment.  We just see evidence of employment for two months,

10   October to -- not even two months, October, she is arrested

11   December 15.  So we're talking about six weeks of employment.

12   That is hardly an employment record that makes her -- that she

13   wouldn't flee.

14        In terms of the list of residence in the community,

15   she has moved houses.  She started out in Virginia and then

16   moved to Maryland.  So even that in and of itself doesn't

17   establish that she is not a risk of flight.

18        When we talked about the expected sentence here.  The

19   maximum sentence in this case, I'm sorry, Your Honor is

20   15 years, but the Guidelines in this case exceed this.  Even if

21   she was charged with obstruction of justice, even that charge

22   wouldn't carry a maximum sentence of 15 years.  That alone

23   speaks to the serious nature of this crime.

24        She assisted people who had kidnapped and murdered

25   someone.  They drove the victim to the crime scene in her

44

1    truck.  That's why she doesn't have it back.  Then after the

2    murder, they went back to her house and she assisted them by

3    burning their bloody clothing.

4           She equivocated during the course of her arrest

5    interview about her being MS-13.  But at one point and at

6    various points, she unequivocally acknowledged her gang

7    membership.  But the fact that she is equivocating at all shows

8    that she is not fully cooperating with law enforcement and

9    being honest.

10          The defense is talking about all of her contacts with

11   law enforcement.  All of those contacts are before she knows

12   that she is the target of the investigation or one of the

13   targets of the investigation.  And the point can get lost in

14   that.

15          Sure, she can come to these interviews and pretend to

16   play along, but not really provide any information, but now she

17   is the target.  She is the one arrested and standing trial or

18   preparing to stand trial.  So the stakes are even higher now.

19          There is no doubt in this case, Your Honor, I would

20   say that her family loves her.  That her father loves her.  But

21   to ask him to be responsible for supervising her behavior is

22   putting too much of a burden on him.  And I don't think the

23   Court can entrust the safety of the community to her father.

24          She was living in his house on Appletree Drive when

25   it was the gang house.  That's the house that they came back to

45

1   after the murder.  The house where her children also resided.

2          Then once she moves to his other home on Locust Lane,

3   again as evidenced by the transcript here, some of the gang,

4   same defendants who were charged in this crime for the

5   kidnapping resulting in death, they are seen on the pole cam in

6   that house.  The same house that her father owns where her

7   children also reside.

8          We are not asking the Court to hold her simply

9   because she is a member of MS-13.  But that is a factor for the

10  Court to consider.

11          The fact that she has lied to law enforcement, the

12  fact that she lied to Pretrial Services denying her gang

13  membership, because she was at one point unequivocal in that

14  interview, she joined because the gang is a family and that

15  they don't judge you.

16          She has a long history with this gang, Your Honor,

17  one that goes back 20 years.  She has been part of their

18  criminal activity by shielding them in their criminal activity.

19  By her own admission, her house is the gang house.

20          So how is she really protecting the safety of her

21  children by allowing them to live and grow up in this so-called

22  gang house by her words.

23          Your Honor, she is a danger because of her -- I think

24  it's indicative -- what's indicative of her danger is her

25  long-standing membership and association with the gang.

46

1          The fact that she herself admitted to trying to stab

2     someone just one week prior to her interview.  She is a risk of

3     non- appearance because she was untruthful to law enforcement

4     about where she was residing.  She was untruthful to Pretrial

5     Services, Your Honor, which is an arm of this Court.

6          She is a risk of flight.  She is a danger to the

7     community.  And she has shown that there is also the concern

8     that she would obstruct justice.  She was obstructing justice

9     to protect other people and now she is the one that is charged.

10          And for all of these reasons, Your Honor, we ask that

11     you uphold the order of detention.

12          THE COURT:  All right.

13          MR. WALSH:  Your Honor, may I just respond?

14          THE COURT:  Two sentences, certainly.  You have had

15     the podium for the last hour, Mr. Walsh, so quickly.

16          MR. WALSH:  I just want to respond to counsel.  But

17     (f), under section (f) is when you do a detention hearing.

18          THE COURT:  I understand the statute.

19          MR. WALSH:  The second thing is that counsel says

20     that when she becomes a target, she doesn't have contact.  She

21     interviewed for two hours and 10 minutes on December 15.

22     That's when they told her, they kept telling her and

23     questioning her about things.  So she cooperated.

24          And the risk of flight is -- it just floors me

25     because she is constantly contacting them.  She tells him she

47

```
 1    lives --

 2              THE COURT:  All right.

 3              MS. WALSH:  The other thing is the presumption of

 4    innocence.

 5              THE COURT:  I understand.

 6              MR. WALSH:  So when they say that --

 7              THE COURT:  You're just repeating yourself.  I've

 8    given you a lot of time.  I don't need you to repeat it.  If

 9    there is something particular you want to address, address it.

10              MR. WALSH:  Well, when she says it is a burden to her

11    father, it's not a burden to her father.  Her father is here.

12              THE COURT:  The father is willing to take the burden.

13              MR. WALSH:  Yeah.

14              THE COURT:  All right.  Thank you.

15              Well, Ms. Sanchez has made her choice in life.  She

16    has chosen to affiliate with MS-13.  You pick up the paper

17    every day and read another story about how dangerous and

18    violent the MS-13 gangs are to our community.  They are a way

19    of life for her evidently.  She has participants not only just

20    in the gang, but in co-defendants in this case.

21              She continues to associate with them long after she

22    has burned the clothing that they a used, that they wore when

23    they killed the victim as the grand jury has found there is

24    probable cause to find.  They use her truck.  It doesn't phase

25    her at all.  She is willing to go in and talk to the law
```

48

1    enforcement for months and months afterwards, knowing what has

2    occurred, and continues to associate with these people.

3            As Ms. Giles said, just being a member of MS-13 is

4    not an offense for which you should be detained, but her

5    participation, her accessory after the fact, her continued

6    association, all the while her family is with her, a clear

7    indication that she is a danger to the community.

8            The violence that is not only attendant to the gang,

9    but the violence that she herself references, an intent to stab

10   somebody, is clearly evidence of her danger, of she herself

11   being a danger to the community.  And also, an indication of

12   having accepted the lifestyle that MS-13 lives by.

13           So, you know, I feel terrible for her family, and her

14   children in particular, that she is incarcerated, but she chose

15   to be involved with this gang all the while that she was at the

16   same time raising this family.  And she knew the risks or she

17   should have certainly known the risks for doing so.

18           Her gang involvement is significant.  And she is

19   clearly a danger to the community, and I think clearly a risk

20   to obstruct the witnesses who she might find out about, or

21   intimidate witnesses she might find out about because of her

22   long-standing acceptance and support of this gang.

23           So I find there are no conditions under which she

24   should be released that would ensure the safety of the

25   community.  And I am going to detain her on that basis.

49

1          All right.  Anything else in this case?

2          MS. GILES:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  All right, we're in recess.

4          We'll come back with our civil docket in a few

5  minutes.

6          -------------------------------------------------
                        HEARING CONCLUDED
7

8

9

10

11

12

13

14

15

16

17

18          I certify that the foregoing is a true and

19      accurate transcription of my stenographic notes.

20

21

22
                     /s/  Norman B. Linnell
23          Norman B. Linnell, RPR, CM, VCE, FCRR

24

25